

**SO ORDERED.**

**SIGNED this 19 day of August, 2009.**

_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DANA C. WERTS and | ) | |
| TROY WERTS, | ) | Case No. 08-40810 |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | |

MEMORANDUM OPINION AND ORDER GRANTING DEBTORS'
MOTIONS TO CONVERT TO CHAPTER 13 AND FOR
INTRA-DISTRICT CHANGE OF VENUE

This matter is before the Court on Debtors' Motion to Convert to Chapter 13[1] and Debtors'

Motion for Intra-District Change of Venue,[2] which seeks to transfer this case to Wichita, Kansas.

The United States Trustee ("UST") objected to the Motion to Convert, arguing that Debtors are not

eligible for Chapter 13 relief. First, he argues that their unsecured debt exceeds the limits set forth

in 11 U.S.C. § 109(e).[3] Secondly, he argues that Debtors should forfeit any right to convert to

_____

[1]Doc. 98.

[2]Doc. 100.

[3]All future statutory references are to the bankruptcy code in effect on the date of filing, 11 U.S.C. §§ 101 - 1532
(2005), unless otherwise specifically noted.

Chapter 13 as a result of their pre-petition conduct, and pursuant to § 1307(c), as described in *Marrama v. Citizens State Bank of Massachusetts*.[4]  Included in this bad faith allegation is the contention that Debtors engaged in fraudulent bankruptcy estate planning, and failed to disclose several assets and transactions on their schedules.  The UST has also objected to the motion to change venue, but only if the motion to convert is denied.

The parties have stipulated to some facts, which are contained in the Pretrial Order,[5] and the Court adopts those facts.  The Court also conducted an evidentiary hearing, at which hearing it was able to evaluate the credibility of the witnesses to assist in making these findings of fact.

The Court has jurisdiction to decide this matter,[6] and it is a core proceeding.[7]

## I.    FINDINGS OF FACT

Debtors filed for relief under Chapter 7 of the Bankruptcy Code on June 16, 2008.  On the date they filed their petition, Mr. Werts had accrued general unsecured debts totaling $161,977.71, and Ms. Werts had accumulated general unsecured debts totaling $100,913.37.  In addition to those amounts, Debtors were jointly liable on a second mortgage on their home.  The debt secured by that second mortgage exceeded the value of the house by $134,760.  Both Debtors have regular income.

One or both Debtors first met with an attorney, Sarah Newell, eight or nine months prior to filing.  At that time, they discussed their financial situation, which had recently deteriorated both

---

[4]549 U.S. 365, 371-75 (2007) (holding that the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate "to prevent an abuse of process" is adequate to authorize an immediate denial of a motion to convert a Chapter 7 case to one under Chapter 13 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors).

[5]Doc. 124.

[6]28 U.S.C. § 1334.

[7]28 U.S.C. § 157(b)(2)(A).

2

because Ms. Werts, a mortgage broker, had been the victim of a downturn in the mortgage business and Mr. Werts had left a steady job to start a new restaurant business that was not working out.  In fact, Debtors' total income had decreased over 40% in 2007, as compared with 2005 and 2006.

Mr. Werts explained that he had entered into a partnership to open an Emerson Biggins ("EB") restaurant in Wichita, Kansas.  To help start and run that business, Mr. Werts incurred a substantial amount of credit card debt.  He disclosed to counsel that he was expecting a cash settlement from the remaining partners in the EB business, which turned out to be $75,000, and  was received October 31, 2008.

Ms. Newell provided some pre-bankruptcy planning advice during that first meeting. According to consistent testimony at trial, counsel did not give Debtors any specific instructions on how to dispose of the $75,000 payment.  Instead, she generally advised them to consider paying down debt secured by exempt assets (i.e., home mortgage and cars), advised that home furnishings were exempt, discussed putting money in an exempt retirement account, and essentially indicated that they needed to get rid of all cash prior to filing or it would become part of the bankruptcy estate and subject to distribution to creditors.

Counsel also advised Debtors to keep close track of how they used the expected proceeds, as the Trustee would require this information.  Following this advice, Debtors used most of the $75,000 to pay some routine bills, make several advanced payments on their first and second mortgages ($21,535 and $7,124, respectively), make car payments ($5,995), buy new furniture for their house ($5,500), make deck repairs ($750), paint their house ($3,650), pay off an unsecured consolidation loan that was guaranteed by a friend and former employer of Mr.  Werts ($12,235), pay attorney fees ($3,000) and take a ski vacation in Colorado ($4,117).

3

In preparation for filing their bankruptcy petition, one or both Debtors again met with counsel and provided her with the information necessary to prepare their bankruptcy schedules and Statement of Financial Affairs ("SOFA"). Notwithstanding the information Debtors had provided to their counsel, Debtors' schedules and SOFA contained numerous omissions and errors, including:

1. Failure to disclose anywhere on the schedules that Mr. Werts had received the $75,000 payment from the EB partnership within 7 or 8 months of filing;

2. Failure to disclose that Mr. Werts held an ownership interest in the EB business within six years of the filing;

3. Failure to disclose irregular payments made to Debtors' creditors, including payments made on Debtors' mortgage with part of the proceeds from the $75,000 buyout;

4. Failure to disclose an interest in a 1992 Ford pickup, valued at $4,000, that was purchased by Ms. Werts' former husband and his father for her son, but which was titled in both the child's name and Debtors' names because the purchasers lived out of state;

5. Understating by over $4,000 the amount of money held in one bank account (the insurance refund account);

6. Failure to disclose three of Debtors' six bank accounts that were open on the petition date; and

7. Failure to disclose a bank account at Bank of America that had been closed within one year of the petition date.

Although the above information was not included in their schedules and SOFA, Debtors had provided to their counsel the information needed to enable her to include it, except for the following: their title ownership interest in Ms. Werts' son's vehicle, the amount of the funds held in one bank account (less than $20), which account had not been used for some time by Debtors, the existence of an incorrect balance in one bank account, and payment for $1,220.29 in clothing.

4

Ms. Newell testified, as will be discussed in more detail below, that she either intentionally omitted the relevant information with the intent to disclose it at a later time, after receiving guidance from the case trustee who would be appointed, inadvertently omitted the items, or deemed some information unworthy of inclusion.[8]  Debtors explained that they had neglected to list the 1992 Ford Bronco because it was purchased for Ms. Werts' minor son by his father and grandfather, and Debtors' names were on the title of the vehicle solely for insurance and titling purposes.  They did not consider themselves to hold an ownership interest in that vehicle.

As to the bank account listed with the incorrect balance ($30 vs $4,639), Debtors explained that their mortgage company had incorrectly paid escrowed money to two insurance companies, when one of the policies had been canceled.  This caused a severe deficit in their escrow account, which they were going to have to reimburse.  Although Debtors knew that the company that had been improperly paid was going to refund the money (which Debtors then immediately repaid to the escrow company to replenish the escrow account), they did not know the money had been directly deposited into this bank account within six days before the bankruptcy filing, and they also did not know exactly what date their counsel would actually file their petition.

Finally, as to one bank account that Debtors had not provided information to their counsel before filing, that account had not been used for over two years, and only held $13.  Debtors had

---

[8]The example of this latter category was seen in Debtors' response to Question 3 on the SOFA (payments to creditors within 90 days of filing exceeding $600).  Ms. Newell said she had not routinely provided detailed information to this question in any filings, unless it could result in a preference claim for the Trustee, but that she does now as a result of lessons learned from this case.

provided information to Ms. Newell about the other omitted bank accounts, but she had failed to include them.  One had no balance and one had a $16 balance.[9]

On July 29, 2008, approximately six weeks after the initial petition and supporting documents were filed, Debtors filed an amended SOFA.[10]  This amended SOFA did list the $75,000 payment Mr. Werts received from the EB buyout, but did not correct any of the other errors contained in the original schedules or SOFA.  On August 13, 2008, Debtors filed an amended Schedule B, which disclosed for the first time a potential sexual harassment claim Ms. Werts may have had against her former employer as of the date of filing.[11]  Again, Debtors did not correct any of the other errors on the schedules at that time.

Following conversations between the UST and Ms. Newell, Debtors filed an Amended Petition along with an amended Schedule B, Schedule D, Schedule F, Schedule I, Schedule J and an amended SOFA in November, 2008.[12]  These amendments corrected all of the errors in Debtors' original schedules and the original SOFA.  On that same date, Debtors amended their Schedule C to claim an exemption in two term life insurance policies, with no cash value.[13]

---

[9]If one excludes the account that had the unexpected insurance refund deposit, and compares the amounts listed in the bank accounts in the original schedules ($130) with those listed in the amended schedules ($76.97), Debtors actually originally overstated the amounts in their accounts, even when they added back in the small amounts in accounts they had inadvertently omitted.

[10]Doc. 16.

[11]Doc. 21.  Ms. Werts has since become re-employed with this employer (after certain management employees left the company), and has taken no steps to pursue this litigation (which is likely the estate's asset).  No evidence was received about whether Ms. Werts has even taken the required steps under state or federal law to put her employer on notice that she has a claim, which notification deadlines are often fairly short, and which could bar pursuit of the claim by her or by the estate.

[12]Doc. 35.

[13]Doc. 36.

6

In January, 2009, the UST filed an adversary proceeding[14] objecting to Debtors' discharge pursuant to § 727(a)(2) and (4). The UST also filed a Motion for Dismissal for Abuse under § 707(b)(3).[15] Three months later, Debtors' current attorney, W. Thomas Gilman, substituted his appearance for that of Ms. Newell. Shortly after Mr. Gilman's entry of appearance, Debtors filed the motion to convert to Chapter 13 and motion for intra-district change of venue that are the subject of this order.

## II.    CONCLUSIONS OF LAW

### A.    Motion to Convert to Chapter 13

#### 1.    Debtors are eligible to be Chapter 13 debtors under § 109(e)

Eligibility to be a debtor under Chapter 13 of the Bankruptcy Code is governed by § 109(e). According to that section, only an individual with "noncontingent, liquidated, unsecured debts that aggregate less than $336,900" is eligible to be a Chapter 13 debtor.[16] One issue in this case is whether Debtors' noncontingent, liquidated, unsecured debts exceeded $336,000 on the date of filing.

This issue is governed, in part, by the answer to the following question: whether the $134,760 undersecured portion of Debtors' second mortgage should be considered unsecured debt for purposes of the § 109(e) debt limitation when another section of the Code, § 1322(b)(2), specifically requires that same debt to be treated as secured for plan confirmation purposes. This second mortgage note is secured only by a security interest in Debtors' principal residence.

---

[14]Adv. No. 09-7002.

[15]Doc. 56. That motion is not currently before the Court.

[16]11 U.S.C. § 109(e).

7

Debtors recognize that the vast majority of courts to have considered this issue, and all circuit courts, have held that the undersecured portion of a secured debt should be considered unsecured debt when determining a debtor's eligibility to proceed under § 109(e).[17]  In general, these courts have applied § 506(a), which splits an undersecured claim into a secured portion and an unsecured portion for bankruptcy purposes, despite the fact the statute speaks in terms of "allowed claims" rather than "debts" in general, "to prevent 'raising form over substance and manipulation of the debt limits' to achieve Chapter 13 eligibility."[18]

For example, in *In re Soderlund*, the court noted that "[r]efusing to count the undersecured portion of a secured creditor's claim as unsecured debt ignores reality and could lead to absurd results."[19]  Similarly, the court in *In re McClaskie*[20] held:

> [I]t is an overly technical reading of § 506(a) and its impact upon a case to ignore the obvious bifurcation which will occur if the claims are filed as scheduled and the debtor's valuation of the liened property is unchallenged.  Instead, this Court finds

---

[17]*See, e.g. In re Scovis*, 249 F.3d 975, 983 (9th Cir. 2001) (holding a bankruptcy court may look past the schedules to other evidence submitted when a good faith objection to the debtor's eligibility under § 109(e) is raised and that entire judgment lien claim against homestead is unsecured for eligibility purposes); *In re Balbus*, 933 F.2d 246, 247 (4th Cir. 1991); *Miller v. United States*, 907 F.2d 80, 81-82 (8th Cir. 1990); *In the Matter of Day*, 747 F.2d 405, 407 (7th Cir. 1984) (holding that a contrary interpretation of § 109(e) could lead to absurd situation where prospective debtor could create security interest in property with little value to circumvent the debt limits); *In re Groh*, 405 B.R. 674 (Bankr. S.D. Ca.  2009) (noting that result required by statute—that the undersecured portion of debt against homestead must be included in § 109(e) eligibility determination—may well, in the current economic environment, make many debtors whose residences had decreased in value ineligible for relief); *In re Grenchik*, 386 B.R. 915 (Bankr. S.D. Ga.  2007 (collecting cases); In *re Hanson*, 282 B.R. 240, 245 (Bankr. D. Colo. 2002) (holding that creditors whose liens were subject to avoidance as a preference had to be treated as holding unsecured claims for purpose of determining eligibility); and *In re Bos*, 108 B.R. 740, 742 (Bankr. D. Mont. 1989) (finding that under facts of that case, "[i]t would defy fair play to allow a Debtor to assert that ... for eligibility requirements, the secured claim is valued $279,800 while for repayment upon confirmation under § 1325(a)(5), the claim will be repaid at $201,700").

[18]*In re Scovis*, 249 F.3d at 983 (quoting *In re Soderlund*, 236 B.R. 271, 274 (9th Cir. BAP 1999)).  *See also In re Grenchik*, 386 B.R. at 908 (citing two cases holding that § 506 only applies in the treatment of claims and not in the calculation of debt, and noting they are in the decided minority).

[19]236 B.R. 271, 274 (9th Cir. BAP 1999).

[20]92 B.R. 285 (Bankr. S.D. Ohio 1988).

8

that the claims process is to be assumed, given the debtor's schedules of values and liabilities, absent a showing of bad faith. To do otherwise is to ignore obvious realities.[21]

And, although decided at a time when the debt limits were significantly lower than they are currently, the Seventh Circuit in *Matter of Day* explained the type of problems that could be created by ignoring the true nature of undersecured debts, as follows:

> These decisions avoid the temptation to raise form over substance and represent a common-sense solution to a statutory interpretation problem not considered by Congress. As noted by the court in *Ballard* [4 B.R. 271 (Bankr. E.D. Va. 1980], a contrary interpretation of section 109(e) could lead, at the limit, to the absurd situation where a prospective Chapter 13 debtor with $449,998 in unsecured debts creates a security interest for $349,999 in property with little or no value. If courts cannot look beyond the mere existence of documents creating such an interest, this maneuver produces secured debts of $349,999 and unsecured debts of $99,999-amounts within section 109(e). Surely Congress did not intend for debtors to so easily circumvent the $100,000 limitation on unsecured debts in Chapter 13 proceedings.[22]

The Court finds the reasoning of those cases persuasive and adopts their approach. Therefore, the Court finds that the undersecured portion of a secured debt should be treated as an unsecured debt for § 109(e) debt limitation calculations.

Debtors alternatively argue that the § 506 analysis should not be applied when the debt in question will be treated as fully secured by operation of law, specifically § 1322(b)(2), which requires that a claim secured only by a security interest in the debtors' principal residence cannot be

---

[21]*Id*. at 287.

[22]*In the Matter of Day*, 747 F.2d at 407.

9

bifurcated and crammed down. Debtors rely on two cases, *In Re Soderlund*[23] and *In Re Winder*,[24] for this proposition, but the Court is not persuaded.

Admittedly, § 1322(b)(2) prohibits Chapter 13 debtors from modifying a mortgage on their principal residence if any portion of that mortgage is secured by the value of the real property.[25] The effect of this statute is to prohibit Debtors from "cramming down" their mortgage, which would allow them to bifurcate the mortgage into a secured portion equal to the value of the property, and an unsecured portion equal to the undersecured portion of the claim. Debtors contend it is unfair to require them to treat the claim as fully secured under § 1322(b)(2), and pay that debt in full during the plan, but then treat that same "unsecured" portion as part of unsecured debt to determine eligibility under § 109(e).

Although the Court agrees with Debtors that the operation of § 1322(b)(2) makes this analysis seem less fair to these Debtors, the Court nevertheless finds that the application of § 1322(b)(2) does not create an exception to the general rule. As the court indicated in *In re Groh*, "[w]hile there is some appeal to looking to a debtor's eligibility as of the moment of filing, *In re Scovis* . . . makes very clear that events like obvious lien avoidance should be considered in

---

[23]236 B.R. 271, 274-75, n.5 (9th Cir. BAP 1999) (holding that the § 506 analysis should be made in determining eligibility, but in dicta stating that the analysis may be different "if the debts in question were entitled to the protection afforded by §1322(b)(2), i.e., a claim secured only by a security interest in real property that is the debtor's principal residence").

[24]171 B.R. 728, 731 (Bankr. D. Conn. 1994) (stating that although a "good faith argument might be made that *Nobelman v. American Savings Bank*, 508 U.S. 324, ... (1993), compels the treatment of such an undersecured claim as a fully secured claim for the purposes of Chapter 13 eligibility," the court declined to so find).

[25]This Court has previously held that if junior mortgagees are wholly unsecured, they may be treated as general unsecured claims in the Chapter 13 plan after a proper Motion to Strip is filed and served on the impacted mortgagee. *Centex Home Equity Co., LLC, v. Woodling*, 2004 Bankr.LEXIS 1751 (Bankr. D. Kan. 2004).

10

determining a debtor's eligibility. There is no reason why the same rationale would not apply to a lien strip-off under 11 U.S.C. § 506(a) and § 1322(b) as it did to a lien avoidance under § 522." [26]

This Court agrees with the *Groh* analysis, and declines to graft additional content onto § 109(e) that Congress did not choose to include, to wit, that the section does not apply to those debts that are truly undersecured, but that will be treated as fully secured for confirmation purposes. The Court, therefore, holds that the undersecured portion of a debt must be included within the unsecured portion of the debt limits in § 109(e) even when the debt in question is a mortgage on the debtors' primary residence.[27]

The Debtors next alternatively argue that because each of them has unsecured debt less than $336,900, because not all of their unsecured debt is joint debt, they should be allowed to proceed as debtors in a Chapter 13 case. The UST objects to this argument, claiming § 109(e) requires both spouse's debts to be considered together when determining whether they fall under the unsecured debt limit. The parties have not provided any case law addressing this issue, and the Court was unable to locate any cases directly on point.[28]

---

[26]405 B.R. at 678.

[27]The Court notes that an even stronger argument for deviation from this rule could be made in the case of automobiles subject to the hanging paragraph at the end of § 1325(a). Claims subject to that statutory provision are not only excluded from bifurcation under § 506, but also require payment in full of the entire debt over the life of a Chapter 13 plan. At least in cases involving long term debts, such as home mortgages, debtors are not required to pay the entire debt over the life of the plan.

[28]Debtors do direct the Court to the following quotation from *Colliers On Bankruptcy*: "Subsection e [of §109] recognizes that a debtor under Chapter 13 must deal with future family expenses and family income as well as preexisting family debts. It attempts to facilitate the treatment of the family as a unit to the extent possible by authorizing spouses to achieve Chapter 13 debtor status jointly if the aggregate of their debts is within the applicable limits. However, in some cases, adding the debts of the spouse will cause those debts to exceed the statutory limits and the limits are not doubled in a joint case. In such cases, only one spouse may be able to file as a Chapter 13 debtor. Alternatively, **if few of the debts are joint, each spouse may be able to file a separate Chapter 13 case.**" *Colliers on Bankruptcy*, ¶ 109.06[4] (15th ed. rev. 2007) (emphasis added).

11

The statute, which is the first place the Court must look, states:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $336,900 and noncontingent, liquidated, secured debts of less than $1,010,650, or an individual with regular income and such individual's spouse, . . . , that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $336,900 and noncontingent, liquidated, secured debts of less than $1,010,650 may be a debtor under chapter 13 [of the Bankruptcy Code].[29]

The UST focuses on the portion of the statute that reads "an individual with regular income and such individual's spouse . . . that owe . . . unsecured debts that aggregate less than $336,900" to support its claim that all debts of both spouses must be combined for purposes of § 109(e).

The Court has located one case that addressed this issue, but it was presented in a significantly different procedural posture. In *In re Weiser*,[30] the debtors filed a joint Chapter 13 petition. One of their creditors objected to confirmation of their plan on the basis that the debtors were ineligible for relief under Chapter 13 because their combined noncontingent and liquidated unsecured debts exceeded the § 109(e) limits. At the confirmation hearing, debtors' attorney made an oral motion to bifurcate the case, apparently in an attempt to cure the § 109(e) problem. The court held that the motion to bifurcate was untimely "in view of the fact that it was not made until the hearing on the lenders' objections to confirmation."[31] The court also noted that it was not aware of any procedure for bifurcating a joint case absent an amended filing or the dismissal of the pending case and the filing of two new individual cases.[32]

---

[29]11 U.S.C. § 109(e).

[30]391 B.R. 902 (Bankr. S.D. Fla. 2008).

[31]*Id.* at 908.

[32]*Id.*

The instant case is in a substantially different procedural posture than was present in *Weiser*. This case was initially filed as a joint Chapter 7, where the debt limits in § 109(e) were simply inapplicable. Debtors are currently before the Court on a motion to convert their case to Chapter 13, and have announced, in the event they are not allowed to proceed in a joint case, their willingness to bifurcate this case in order to qualify as Chapter 13 debtors. This action is being taken before a Chapter 13 plan has even been filed. This is significantly different than in *Weiser*, where the court denied the oral request to bifurcate because it was presented too late in the proceeding.

The Court finds that the statute in question does not mandate that married persons combine their unsecured debt (regardless which spouse has personal liability for that debt) for purposes of the debt limits in § 109(e). Rather, § 109(e) provides for two groups of people who can be Chapter 13 debtors. The first of these groups includes individuals with regular income who meet the debt limits. If an individual has regular income, and that individual's debts are below the limits established by § 109(e), then that individual qualifies to be a Chapter 13 debtor.

The second group provided for under § 109(e) includes individuals with regular income and their spouse, provided their aggregate debts do not exceed the debt limits. This additional provision is necessary to avoid situations where married couples would prefer to file a joint Chapter 13 proceeding, but only one spouse has regular income. Without specifically including the spouse of an individual with regular income in § 109(e), single income couples could be precluded from filing a joint Chapter 13 case because the spouse without regular income would not qualify.

13

In general, filing a Chapter 13, instead of proceeding under Chapter 7, is viewed favorably by Congress, and many statutory provisions reflect that policy choice.[33] To read § 109(e) in the manner proposed by the UST, which would essentially only allow married debtors half of the debt limits allowed for individual debtors, would clearly not further the goal of encouraging Chapter 13 filings.

The Court finds that a more reasonable reading of the statute, and one that furthers the goal of encouraging Chapter 13 filings, is that the provision dealing with "an individual with regular income and such individual's spouse" is intended to apply in those cases where the spouse could not otherwise be a Chapter 13 debtor, because he or she is not "an individual with regular income." If each spouse has regular income, and each spouse separately qualifies under the debt limits of § 109(e), then each spouse should be entitled to file his or her own Chapter 13 case—even if the debts of both spouses together would exceed the debt limits.[34]

If a husband and wife can each file separate Chapter 13 proceedings, where their own individual debt is within the § 109(e) limits, the Court can think of no reason why a husband and wife could not file a joint petition, as authorized by § 302(b). A similar issue was raised in the

---

[33]For example, debtors in Chapter 13 proceedings are entitled to a "superdischarge" which, although not as expansive as it was prior when the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective (11 U.S.C. §§ 101 - 1532 (2005)), still allows debtors to discharge some debts that would be non-dischargeable in a Chapter 7 proceeding, such as debts incurred as part of a property settlement in a divorce case. *See* §§ 1328 and 523(a)(15).

[34]*See In re Feltman*, 285 B.R. 82, 86 (Bankr. D. D. Col. 2002) (holding that § 302 does not compel a husband and wife to file a joint petition, but rather that they are entitled to file separate Chapter 13 cases if they so desire). It is important to note that the facts of this case are such that a significant portion of each Debtors' debts are individual and are not joint debts. The outcome of this case would certainly be different if all of the debts in question were joint debts, and Debtors were attempting to divide those joint debts so as to qualify under § 109(e). *See, e.g. In re Cronkleton*, 18 B.R. 792, 793 (Bankr. Ohio 1982) (holding that where each debtor was co-maker on all debts and each owed the entire obligation, the "attempted splitting of this obligation between the two debtors in order to qualify under the debt limitation ceiling contained in § 109(e) under the guise that the remainder of the debt is 'contingent' is not permissible.").

14

context of allowing debtors to claim separate allowances for housing expenses in a means test calculation in *In re Crego*.[35]  In *Crego*, the debtors, who lived apart, sought to claim two separate household expenses on Form 22.  In responding to the trustee's objection, the Court stated:

> Of course, in any of these cases, a trustee's objection could be overcome by having the spouses file separate petitions. However, "machinations" such as forcing the Debtors to pay a second filing fee, file another set of schedules and plan, and arrange a new set of hearings "elevates form over substance."   In this case, the Court does not find that the circumstances necessitate forcing either of the Debtors to file separate petitions, as separation of the cases would not make more money available to the unsecured creditors than there is in this joint case. In fact, there may well be less money available due to the expenses incurred in filing a second petition.[36]

Section 302 provides that "[t]he filing of a joint petition under Chapter 13 by a husband and wife does not automatically result in the substantive consolidation of the two debtors' estates."[37]  Instead, § 302(b) provides that "after the commencement of a joint case, the court shall determine the extent, if any, to which the debtors' estates shall be consolidated."  To read § 109(e) in a manner that would allow married debtors to each file their own Chapter 13 cases, but forbid them from doing so jointly, is counterintuitive in light of § 302 and would elevate form over substance.  Because the separate estates in this case have never been substantively consolidated, Debtors in this case could seek to bifurcate their current joint case and proceed as two separate cases, each under Chapter 13.  That said, the Court sees no reason to read § 109(e) in a manner that would require them to waste their resources and judicial resources jumping through such hoops if there would be no benefit to anyone in doing so.

---

[35]387 B.R. 225 (Bankr. E.D. Wis. 2008).

[36]*Id.* at 229 (internal citations omitted).

[37]1 Keith M.. Lundin, Chapter 13 Bankruptcy § 7.1, p. 7-2 (3d ed. 2000 and Supp. 2007-1).

15

Allowing Debtors in this case to proceed as Chapter 13 Debtors, while keeping their estates separate based upon their own individual debt obligations, does pose some potential procedural difficulties, and could thus require bifurcation. For example, it could be necessary for Debtors to file individual Chapter 13 plans, if they are repaying separate debt.[38] As noted below, the Court will grant Debtors' motion to change venue to Wichita, which will result in the reassignment of the case to a new judge and a new Chapter 13 Trustee. The Court believes that the newly assigned judge and Chapter 13 Trustee should determine how this case is handled, procedurally, and will defer to them to resolve any procedural issues that may arise following conversion to Chapter 13.[39]

> ### 2. Debtors did not engage in prepetition bad faith that would bar conversion of their Chapter 7 case to one under Chapter 13.

In *Marrama v. Citizens State Bank of Massachusetts*,[40] the Supreme Court held that a debtor does not have an absolute right to convert to Chapter 13, and in fact can forfeit the ability to proceed under Chapter 13, if the court finds that the debtor had engaged in prepetition bad faith conduct sufficient to establish "cause" that would ultimately warrant dismissal or reconversion of a Chapter 13 case. Section 1307(c) provides that on a motion by a party in interest or the trustee, the court "may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case

---

[38]*See Id.* at § 7.1, p. 7-4.

[39]For example, 28 U.S.C. § 1930 and the Bankruptcy Court Miscellaneous Fee Schedule attached thereto, specifically provide, at paragraph ¶ 19, that if joint debtors move to reconsolidate or bifurcate their cases, that motion incurs a fee equivalent to the current filing fee for the chapter under which the joint case was commenced.

[40]549 U.S. 365.

under this chapter . . . for cause . . . ."[41]  Thus, it is appropriate for bankruptcy courts to evaluate a motion based on § 1307(c) when a Chapter 7 debtor seeks to convert a case to Chapter 13.

The Court must first decide who has the burden of proof on this issue.  Because denying a debtor's motion to convert from Chapter 7 to Chapter 13 has essentially the same result as conversion or dismissal under § 1307, "courts should apply the same good faith standard when evaluating a debtor's motion to convert to Chapter 13 as is utilized when considering dismissal or conversion of a case under § 1307(c)."[42]  "Under this standard, whether a debtor is filing under chapter 13 in the first instance or seeking chapter 13 relief via conversion from chapter 7, the 'key inquiry' for courts attempting to ascertain a debtor's good faith 'is whether the debtor is seeking to abuse the bankruptcy process.'"[43]

Although neither the parties nor the Court were able to locate any Tenth Circuit precedent on the issue, the overwhelming majority of Courts have held that the party moving to dismiss or convert a case under § 1307(c) bears the burden of showing that the case was not filed in good faith.[44]  This Court agrees with the reasoning of the majority, and holds that, although a debtor bears the burden of proving that a plan was filed in good faith under § 1325(a), the burden of showing that

---

[41]*Also see In re Alexander*, 363 B.R. 917, 925 (10th Cir. BAP 2007) (citing *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993)).

[42]*In re Condon*, 358 B.R. 317, 326 (6th Cir. BAP 2007).

[43]*Id.* (quoting *In re Alt*, 305 F.3d 413, 419 (6th Cir. 2002)).

[44]*See, e.g., In re Condon*, 358 B.R. at 326 (holding that creditor opposing conversion to Chapter 13 bears burden of showing that case would be subject to conversion or dismissal under § 1307(c)); *In re Sullivan*, 326 B.R. 204, 211 (1st Cir. BAP 2005) (holding that under § 1307(c), objecting creditor bears the burden of proof, while under § 1325(a)(3), debtor bears the burden of proof); and *In re Haque*, 334 B.R. 486, 489 (Bankr. D. Mass. 2005) (holding that while debtor bears the burden of proof under § 1325(a)(3), objecting creditor bears burden of proof under § 1307(c)).

17

a case was filed in bad faith so as to require conversion or dismissal under § 1307(c) falls on the party seeking such conversion or dismissal.[45]

The Trustee alleges Debtors engaged in the following "bad acts" that should disqualify these Debtors from converting their case:

1.    Failure to disclose the $75,000 payment received from the EB transaction;

2.    Failure to disclose Mr. Werts' ownership interest in EB;

3.    Failure to disclose several bank accounts (and the wrong balance in one);

4.    Failure to disclose an ownership interest in Ms. Werts' son's automobile; and

5.    Improperly disposing of the $75,000 payment through pre-bankruptcy estate planning.

Whether a Chapter 13 case has been filed in bad faith must be determined by looking at a totality of the circumstances.[46]

Some factors to consider when analyzing bad faith under § 1307(c) include:

the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.[47]

The last factor is the one that is the core of t he UST argument—whether Debtors were forthcoming with the Court and creditors, in light of numerous errors in their schedules and SOFA.

---

[45]The Court notes, however, that in this case the burden of proof is not a determinative factor, as even if the burden of proof rested on Debtors, the Court finds they would have met that burden.

[46]*In re Gier*, 986 F.2d at 1329.

[47]*In re Condon*, 358 B.R. at 326.

18

Debtors acknowledge that significant deficiencies existed in their schedules, and admit they amended their schedules once they understood both the seriousness of the matter, and that they were required to provide all the information requested by the schedules and SOFA. However, they claim not only did they not intend to conceal estate assets or the information pertinent to the EB transaction, but that they had provided all of this information regarding EB to their attorney prior to filing, and that it was her professional decision not to initially include the information on the schedules and SOFA. Debtors' argument on this point was supported at trial both by the testimony of the Chapter 7 Trustee and by the testimony of the attorney who elected to omit the information.

First, Patricia Hamilton, the Chapter 7 Trustee, testified concerning her contacts with Ms. Newell and the inaccuracies in the schedules and SOFA. Ms. Hamilton testified that after her initial review of this case, based on her extensive experience as a Trustee, she believed there must be some inaccuracies in the petition and SOFA. According to Ms. Hamilton, it is unusual to see debtors with such large debt, particularly unsecured debt, without either substantially more assets or without some business involvement.

Ms. Hamilton testified that she mentioned the apparent discrepancies in the schedules to another attorney, who informed Ms. Hamilton that he had been retained to represent Debtors at their first meeting of creditors (which ended their conversation). As a result of that conversation, however, that attorney contacted Ms. Newell and informed her of Ms. Hamilton's concerns. Ms. Newell then immediately contacted Ms. Hamilton to discuss the case and informed Ms. Hamilton that there were some inaccuracies in the schedules and SOFA. Ms. Newell informed Ms. Hamilton that because she had been unsure how to disclose the EB payment, because Debtors did not include it as income on their taxes, she had specifically advised Debtors not to include it in the initial filing,

19

advising them that she would later contact the appointed Chapter 7 Trustee to discuss how to reflect this transaction. Ms. Hamilton testified that as a result of that late disclosure, she sought additional information from Ms. Newell, who freely provided all information sought by Ms. Hamilton.

Ms. Newell also admitted that Debtors did disclose to her all of the information about the EB transaction, pre-petition, and that it was her sole decision not to initially include it on the schedules. According to Ms. Newell, she could not ascertain where to place the information on the schedules or the SOFA, and she decided to simply omit the information until she could have a conversation with the appointed Trustee. Ms. Newell also testified that the other errors and omissions in the schedules and SOFA were also a result of her errors, and, except as has been specifically addressed elsewhere in this opinion, Debtors had provided her with full and accurate information with the understanding she would include that information on the schedules.

Debtors' testimony was consistent with that of both Ms. Hamilton and Ms. Newell. Debtors indicated that they provided all of relevant information to Ms. Newell and that it was Ms. Newell's decision to omit certain information. Debtors testified that they only cursorily reviewed the schedules and SOFA prior to signing them, but that they assumed Ms. Newell had properly included all the information that legally needed to be included and trusted her professional judgment about what needed to be included, and what need not be. They also indicated that they did not truly understand that the documents were being signed under penalty of perjury, despite the exceedingly clear language so stating contained immediately above their signature blocks on both the schedules and the SOFA. Similarly, Debtors also testified under oath at their first meeting of creditors that the information contained in the schedules was true, correct and complete, which it clearly was not.

Case 09-12862   Doc# 131   Filed 08/19/09   Page 20 of 29

Debtors were also required to provide explanations to the Trustee for items that were either incorrect or omitted from their schedules, in the very few instances where such errors or omissions were not a result of Ms. Newell's actions. In one instance, Debtors failed to accurately disclose the balance of a checking account. As outlined above, Debtors clearly and persuasively explained how that direct deposit had occurred, that they were unaware the deposit had been made as of the date of filing, and that they never really consider this refund to be "their" money, since they needed to return the money to their mortgage company to hold in escrow or they would be facing a very large escrow shortage. Although their belief was legally incorrect, the Court finds Debtors' explanation credible, and thus finds that there was no bad faith involved in their failure to initially include this directly-deposited amount on their schedules. It was an honest error by Debtors, complicated by the timing of the deposit.

Debtors also testified that they failed to provide Ms. Newell with the information on one bank account. They explained that the account had not been used for some time, had a very small balance, and that they had simply forgotten about the account when turning over all of their financial information to counsel. The Court also finds this testimony to be credible, especially given the fact that there appears to have been no motive[48] for Debtors to have failed to disclose this account or to try and conceal its existence, especially considering the de minimis balance contained in the account.

Although the Court ultimately finds that the numerous errors and omissions do not constitute bad faith under the totality of the circumstances, the Court cannot gloss these facts without additional comment both as to the decisions of Debtors' original counsel in filing the petition and SOFA, and

---

[48]*See In re Ford*, 492 F.3d 1148, 1156 (10th Cir. 2007) (noting that a debtor's inadvertence in failing to disclose an asset in bankruptcy can be established by showing either that the debtor had no knowledge of the asset or the debtor had no motive to conceal it).

as to Debtors' own cavalier treatment of their bankruptcy filing. First, as an experienced bankruptcy attorney, and an attorney who assists a Chapter 7 Trustee, Ms. Newell clearly understands the degree of reliance that trustees must and do place in sworn schedules. Based on that experience, the Court would have expected Ms. Newell to consult with other members of her firm, one of whom is a long-standing Chapter 7 trustee and who undoubtedly has reviewed hundreds and maybe thousands of schedules and SOFAs, to obtain advice where to put the information about the EB transaction with which she struggled.[49]

Notwithstanding these concerns, the Court is convinced by the consistent testimony of Ms. Hamilton, both Debtors, and Ms. Newell, herself, that she had no intent to hide information from the Trustee, creditors or the Court, but that instead, she made a serious error in professional judgment when she did not abide by the mantra of all good debtors' attorneys, which is to "disclose, disclose and disclose."[50] This judge cannot think of a fact pattern where it would be proper to intentionally fail to include information on the schedules or SOFA about a debtor's recent receipt of $75,000, with the intent to later call the case trustee and discuss the information. As the dissent in *Marrama* noted:

> A debtor who is convinced that he or she can successfully conceal assets has a significant incentive to pursue Chapter 7 liquidation in lieu of a Chapter 13 restructuring. If successful, the debtor preserves wealth; if unsuccessful, the debtor can convert to Chapter 13 and land largely where the debtor would have been if he or she had fully disclosed all assets and proceeded in Chapter 13 in the first instance.[51]

---

[49]Clearly, by the time of the November amendments, counsel had learned that there were many places on the forms where the information could logically have fit, as she added information about the EB venture no less than in the following four places at that time: Question 2 on the SOFA concerning income from employment or business, Question 10 on the SOFA regarding transfers of property within two years of filing, Question 18 on the SOFA requiring name and location of any business interests within six year of filing, or Question 19 on the SOFA, which requires debtors to list bookkeepers or accountants who have business records within two years of filing.

[50]Ms. Newell's testimony at trial, and her demeanor at trial, reflect that she regrets these errors, has learned from the experience, and has reformed her practice.

[51]549 U.S. at 382-383.

The case trustee, the United States Trustee, the Court, and the creditors have the right to immediately receive all pertinent information from the outset of the case. The schedules and SOFA explicitly mandate what information is required, and counsel never gets to choose to not disclose all that information.

If Ms. Newell was unsure where the information should be placed, or how it should be categorized, the appropriate action would have been to use her best judgment and disclose it somewhere. Even electing to add an asterisk and to insert an additional sheet outlining the transaction, would have been preferable to simply omitting the information because of counsel's difficulty understanding the perfect place to disclose it. Had that been done, the case trustee and creditors would have at least known about the payment and could have inquired further, if needed.

The Court is similarly disturbed with Debtors' apparent complacency about their duty to file accurate schedules.[52] Although Debtors testified they did not actually realize the schedules were being signed under oath, and would have taken them much more seriously had they understood the severity of the consequences for errors, these are two mature, college-educated debtors who have or have had responsible positions in the financial world. The Court believes they likely understood the importance of filing signed documents in a court of law, and certainly understood at the first meeting of creditors that they were being put under oath prior to attesting to the accuracy of their schedules and SOFA.

---

[52]By way of example, Debtors' unsecured debts were apparently overstated in their original schedules by almost double ($262,000 compared with $405,000), and debtors did not read their schedules carefully enough to even catch that error. Accordingly, although this Court holds debtors' counsel to high standards of accuracy, the Court recognizes they cannot be perfect and that debtors are expected to carefully read what is presented to them and sign ONLY after that careful review.

That said, the Court understands that these Debtors elected to rely too much upon their attorney's advice that it was acceptable to exclude certain items as long as the information was orally disclosed to the trustee, and relied on their counsel's experience to accurately place in the schedules whatever was legally required from the information they had provided her. Because their counsel admits Debtors had provided, pre-filing, the most significant information that was omitted, the Court will not at this juncture punish Debtors for the omissions of their attorney.

Accordingly, although the Court is troubled by the actions of each Debtor and Ms. Newell regarding the errors and omissions on the schedules, the Court does not find that those actions rise to the level of bad faith that would render Debtors ineligible for Chapter 13 relief. Critical to this finding is the testimony of the Chapter 7 Trustee, who testified that once her initial concerns about the schedules were discussed with counsel, Debtors were at all times cooperative in providing follow-up documentation about all bank accounts and other identified issues, they answered all of her questions in a timely fashion, and, most importantly, that she never felt Debtors were being deceptive or uncooperative in their responses to her. When the Court assessed each Debtors' credibility during their testimony, this judge came away with the same impression.

The Court also finds that Debtors' actions in disposing of the $75,000 payment from the EB buyout in the 7-8 months prior to the filing of the case do not rise to the level of bad faith. Typically, engaging in pre-bankruptcy planning by converting non-exempt assets into exempt assets, without more, does not constitute bad faith.[53] However, the UST contends that bad faith does exist here

_____

[53]*In re Warren*, 512 F.3d 1241, 1249, 1250 (10th Cir. 2008) (holding "we are most reluctant ... to recognize a conversion of nonexempt assets to exempt assets as fraudulent," but declining to fully embrace the proposition that "a debtor's right to make full use of statutory exemptions is fundamental to bankruptcy law."); and *In re Carey*, 938 F.2d 1073 (10th Cir. 1991) (holding "We start with the premise that 'the conversion of nonexempt to exempt property for the purpose of placing the property out of reach of creditors, without more, will not deprive debtor of exemption to which he otherwise would be entitled" and citing to House and Senate Reports accompanying the Bankruptcy Reform Act of

because Debtors accumulated a fairly significant amount of unsecured debt in connection with the EB business, itself, and should have used the $75,000 payment to repay some of that debt, rather than using it to pay down their mortgage or for a family vacation.

In response, Debtors testified that they did in fact intend to use the EB payment to repay some of their business debt. However, Ms. Newell specifically advised them that the law allowed them to use the money in a fashion that would best benefit their future financial fresh start, rather than that of their creditors or the bankruptcy estate. Debtors stated that they simply followed the pre-bankruptcy planning advice offered by their attorney, and were not acting in bad faith.

The Court agrees that the pre-bankruptcy planning in this case is more troubling because the $75,000 lump sum received pre-petition was effectively derived from the money that Debtor had borrowed to start the EB business. However, given the totality of the facts in this case, including the legally-correct advice offered to Debtors by Ms. Newell and the fact that Mr. Werts could not have reasonably predicted the bad outcome of the EB transaction when he incurred the debts, the Court does not find that Debtors engaged in pre-bankruptcy planning in this case in a manner or to a degree that amounts to bad faith. The vast majority of the money went to establishing Debtor's future financial stability, which fit the advice they had received from counsel.[54]

Finally, the Trustee suggests these Debtors' luxurious lifestyle is reason to deny them Chapter 13 relief. The first problem with this argument is that Debtors incurred the significant part of that

---

1978 that "As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law").

[54]The Court finds it was decidedly poor judgment for Debtors to spend over $1,000 on clothing, or over $4,000 on a ski vacation in light of their financial situation, but that such poor judgment does not here rise to the level of bad faith.

lifestyle, especially the now $500,000 house, in 2000, or eight years prior to filing bankruptcy, and at a time when both Debtors earned substantially more income. They bought this house long before Mr. Werts decided to leave his stable job for employment with a restaurant franchise that he had every reason to think would succeed because he had "put it under a microscope" before leaving that stable job. Similarly, the house (which may well be too expensive for these Debtors' present income) was also purchased years before Ms. Werts' income precipitously declined because of the decline in the real estate market. Although it is not financially wise to "spend up" to the amount of one's income, without having a significant safety net, the Court believes Debtors that neither of these events were predictable.

Furthermore, at trial, Debtors admitted that they can no longer afford this house with their current income. They pledged that, if allowed to convert, they would propose a plan whereby the second mortgagee would voluntarily agree to have its lien stripped down to the value remaining for that mortgage and if that creditor declines to do so, they will surrender the house. Nothing in this opinion will prevent creditors or the Chapter 13 Trustee from objecting to confirmation on the basis that any plan that Debtors ultimately file is not good faith, including that their expenses are not reasonable and necessary.[55]

After carefully reviewing all the exhibits and testimony, and considering those facts under the totality of the circumstances, the Court finds that this case was not filed in bad faith. The Court is not left with the impression that Debtors intentionally misrepresented facts in their petition,

---

[55]Indeed, the Supreme Court, in *Marrama v. Citizens Bank of Massachusetts,* 549 U.S. at 375 n.11, cited with approval the following quotation from *In re Love*, 957 F.2d 1350, 1356 (7th Cir. 1992): "Because dismissal is harsh ... the bankruptcy court should be more reluctant to dismiss a petition ... for lack of good faith than to reject a plan for lack of good faith under Section 1325(a)."

Case 09-12862   Doc# 131   Filed 08/19/09   Page 26 of 29

unfairly manipulated the Bankruptcy Code, or otherwise filed the petition in an inequitable manner. The Court also finds it important that the errors and omissions, although significant, do not appear to have had a direct impact on creditors. None of the information omitted from the schedules, with the exception of the bank account that held the directly-deposited insurance refund, would likely have resulted in increased funds for the bankruptcy estate. Although a lack of harm to creditors is not required for a showing of bad faith, the Court does find that it substantiates Debtors' claims that they did not have the intent to be deceitful or misleading, or to conceal assets.

Accordingly, based upon this Court's finding that Debtors' actions prior to filing this case did not rise to a level of bad faith that would prevent conversion, the Court finds that the case would not be subject to dismissal or conversion under 1307(c). Therefore, the motion to convert will not be denied on that basis, either.

**B.** **Motion for Change of Venue**

Debtors have requested that, in the event the motion to convert is granted, they be allowed to transfer this case to Wichita, Kansas in an intra-district change of venue. The UST has stated in the Pretrial Order[56] that it does not object to this transfer if the motion to convert is granted.

The Court finds that transfer is appropriate. With the case proceeding under Chapter 13, a new case trustee will have to be appointed and much of the analysis will have to begin anew. For example, the important analysis a Chapter 13 Trustee must perform, including whether any plan meets the best interest of the creditors test, whether the plan is feasible, and whether the plan has been filed in good faith, has not yet been done by the professionals, so transfer to another Trustee and another court will not result in significant duplication of effort. Furthermore, it makes sense to

---

[56]Doc. 124, § 8, p. 7.

allow this case to proceed in Wichita since Debtors reside in Wichita and their attorney regularly practices in Wichita. Therefore, the Court will grant the motion to change venue.

## III. CONCLUSION

The Court finds that Debtors' motion to convert to a Chapter 13 proceeding and for intra-division change of venue should be granted. While the undersecured portion of Debtors' second mortgage is considered unsecured debt when analyzing whether Debtors are eligible to be Chapter 13 debtors under § 109(e), the Debtors may nevertheless proceed as Chapter 13 Debtors, since both spouses are eligible under § 109(e) to be Chapter 13 debtors because each has debt that falls below the unsecured debt limit and each has regular income. The Court also finds that this case was not filed in bad faith, despite the rather extensive errors and omissions contained in the schedules and SOFA, and that it should therefore not be dismissed on that basis.

**IT IS, THEREFORE, BY THE COURT ORDERED** that Debtors' Motion to Convert to Chapter 13[57] is granted.

**IT IS FURTHER ORDERED** that Debtors' Motion for Intra-District Change of Venue[58] is granted. This case will be transferred to the Court's Wichita Division for all further proceedings. In addition, after consultation with the Wichita, Kansas Clerk's office, the Court sets this to the Court's confirmation docket on October 7, 2009 at 10:30 a.m. Although the case may not be in a posture for confirmation at that time, this Court sets this matter to that docket so that the parties, and the new Clerk's office, will better be able to track this proceeding.

---

[57]Doc. 98.

[58]Doc. 100.

28

**IT IS FURTHER ORDERED** that the hearing set for August 25, 2009 at 1:30 in this Court

is canceled, since the case is being transferred to the Wichita division.

###

Case 09-12862    Doc# 131    Filed 08/19/09    Page 29 of 29